IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY AMADOR, | No. C 06-0493 JSW (PR) |
| Petitioner, | No. C 08-1467 JSW (PR) |
| vs. | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| A.P. KANE, Warden, | |
| Respondent. | |

## INTRODUCTION

Petitioner, a prisoner of the State of California, currently incarcerated at the Correctional Training Facility at Soledad, filed this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Prison Terms' ("BPT") denial of parole during parole suitability proceedings in 2005 and 2007. With regard to both petitions, this Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support of each. Petitioner has filed a traverse. For the reasons stated below, the petition is denied on the merits.

## BACKGROUND

Petitioner was convicted of second degree murder in Los Angeles County Superior Court in 1980 and was sentenced to 15 years-to-life in state prison. Petitioner's minimum eligible parole date was September 2, 1988. In this habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges that his due process rights were violated by the denial of parole during his eighth subsequent parole suitability hearing on January 5, 2005 and then again on February 6, 2007.

**Commitment Offense**

The Board relied in part on the following account of Petitioner's commitment offense set forth in the probation officer's report at both hearings:

> On Monday, July 23rd, 1980, Long Beach police officers responded to 1506 East 63rd Street, Long Beach, California, after receiving a report of a dead body. The report came from Michael Jensen, brother-in-law of Henry Amador. Amador and his estranged wife, Karen Amador, had been residing with Jensen. Officers were informed by Jensen that he found the body of Karen Amador buried in the backyard of her – of his residence. Jensen reported the victim had been missing since the previous Wednesday. Jensen said Amador had been acting strangely and had decided to plant a garden. Jensen became suspicious and felt that Amador may have killed Karen Amador and buried her in the backyard. Jensen checked out the backyard and found the body of Karen Amador. An autopsy performed on July 23rd, 1980 revealed the cause of death was due to massive brain damage caused by multiple blunt force injury. The scalp was not present and an extremely large portion of the skull was missing. The brain was no longer present. Subsequent investigation revealed that the defendant had killed Karen Amador in his van with a hammer on Wednesday, July 16, 1980, and had buried the body on Saturday, July the 19th, 1980.

(*See* Respondent's 2006 Answer, Exhibit 2 (hereinafter "2006 Ex. 2") at 11-12, 2006 Ex. 3 at 5-6; Respondent's 2008 Answer, Exhibit 2 (hereinafter "2008 Ex. 2") at 15-16; 2008 Ex.4 at 5-6.)

**2005 Parole Proceedings**

At the 2005 parole hearing, Petitioner appeared with counsel before a BPT panel. The Board relied on the description of the life crime in the probation officer's report, set forth above. At the hearing, Petitioner admitted that he committed the crime. (2006. Ex. 2 at 13.) He testified that he had come to hate the victim, his former wife, who was in a wheelchair due to a lifelong bone disease that gave her brittle bones. *Id.* at 18. Petitioner testified that he resented that they had no privacy, due to intrusions from the victim's family, including her mother, who the victim wanted to live with them constantly because she needed a caretaker. *Id.* Petitioner further testified that the victim relied on him for simple daily functions, such as taking a bath, and that the victim didn't want others to help her, as her physical deterioration bothered her. *Id.* at 18-19.

Petitioner testified that the victim lashed out at him and their son, because her

2

1   condition bothered her and she didn't want other people in her life caring for her. *Id.*
2   Petitioner contends that, he "was stressed out because of this." *Id.* at 20.  Petitioner was
3   asked by the Board about what happened to the victim's brain, part of her skull and her
4   scalp which were missing when her body was discovered.  Petitioner explained that he
5   did not know what became of her skull and brain or how many times he had hit her with
6   the hammer,  but that after the murder, he had washed the van out at a carwash, picked
7   up the victim's dog and buried the body after the murder. *Id.* at 20-23.
8        Petitioner told the BPT that he had previously been arrested for "wife beating."
9   *Id.* at 24.  Petitioner explained to the Board that he had beaten the victim twice before the
10  murder, and explained that the first time was in 1976, when he became jealous that she
11  was flirting with another man, and again in 1978, and that both times he could not say
12  how badly he had beaten her. *Id.* at 27-30.
13       Asked why he remained involved with the victim, he stated that notwithstanding
14  their conflicts, he felt he couldn't walk away from the relationship with the victim
15  because he was her husband and caretaker and he "felt like I was being relieved of my
16  duty and it was very difficult." *Id.*  Petitioner wanted his son to have a mother, and
17  despite the fact that he had another girlfriend after their separation, he and the victim
18  continued to see each other. *Id.* at 24-25.
19       The BPT also considered Petitioner's post-conviction factors, including his
20  conduct in prison.  Petitioner's two 2004 psychiatric reports were considered by the
21  panel, as was his disciplinary record. *Id.* at 40.  Petitioner had the lowest possible
22  classification score for an inmate serving a life sentence. *Id.* at 39.  Petitioner's most
23  recent serious disciplinary report was in 1989 for inappropriate contact in the visiting
24  room, he had two "128s" in 1995 and, most recently, a "work counseling chrono" in
25  2003, which he received along with his entire work crew for failing to attain their work
26  goals. *Id.*  However, Petitioner had a very positive work history in his garment-making
27  job, including a 2002 prison staff commendation for his work. *Id.* at 41-42.
28

The BPT took into consideration the belief of Petitioner's counselor that he poses a low degree of threat to the public if released from prison, with the only significant risk factor being return to alcohol use. *Id.* at 47-49. A deputy district attorney from Los Angeles appeared to oppose Petitioner's parole and a letter was also admitted from a Lieutenant in the Homicide Division of the Long Beach Police Department opposing parole. *Id.* at 60-63. The assistant district attorney opposed Petitioner's parole based on the viciousness of the crime, Petitioner's failure to adequately address his problem with domestic violence and spousal abuse as well as his lack of honesty with the panel at the hearing. *Id.* at 67-69.

After recessing to consider the evidence before it, the BPT found that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The presiding Commissioner explained that, in deciding to deny parole, the panel considered all of the information received from the public and found that the crime was especially cruel and callous, as the victim was confined to a wheelchair, had been subjected to prior domestic violence, was beaten with a hammer, her brain and scalp were missing and that the victim was abused, and that the crime was carried out in a dispassionate manner and appeared calculated. The fact that the skull, scalp and brain were missing was evidence that the body was defiled and was mutilated either during or after the offense. The BPT further found that the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering and that the motive was inexplicable or very trivial in relationship to the offense.

The BPT considered positive aspects of Petitioner's case, including progress made as a result of prison programming and a recent psychological evaluation showing that Petitioner has a reduced potential for violence relative to the average prison population and within the community, assuming he remains free of alcohol use. The BPT considered Petitioner's parole plans and indicated that he needed to solidify parole plans

4

in a particular county, instead of "all over the place[.]" The BPT noted the opposition of the Long Beach Police Department and the Los Angeles County District Attorney's Office to Petitioner's parole.

The BPT found that Petitioner needed to further involve himself in self-help programming that will "give him insight into the motives and into the reasons that this crime was committed" and would enable him to "face, discuss, understand and cope with stress in a non-destructive manner." *Id.* at Decision Page ("DP") 5. The BPT found that until enough progress is made, Petitioner "continues to be unpredictable and a threat to . . .others." *Id.* The Board commended Petitioner on his gains from a vocational and disciplinary standpoint. The BPT stressed that a significant factor in the two year denial was from Petitioner's testimony, that it did not appear that he had "appropriate insight into why you committed this crime." *Id.* The Board requested a full psychological evaluation of Petitioner before the next hearing, especially directed at violence potential and his ability to refrain from alcohol use upon release.

**State Court Proceedings**

Petitioner challenged the BPT's decision in the state superior, appellate and supreme courts. The Los Angeles County Superior Court issued the last reasoned opinion denying Petitioner's claims. In the decision, Judge Wesley found that the Board's decision was supported by "some evidence" in the record for its finding that Petitioner is unsuitable for parole because the crime was "dispassionate and calculated," that it demonstrated an "exceptionally callous disregard for human suffering" and that the victim was "abused, defiled or mutilated" during the crime, citing the applicable regulations. 2006 Ex. 4 at 2. The court also found some evidence to support the Board's finding that the motive was "very trivial" and that Petitioner was unsuitable based on prior violence against the victim. *Id.* at 4-5. The court found that, despite gains made in prison, the record supports the Board's finding that Petitioner would pose an unreasonable threat to public safety if released on parole. *Id.* at 5. After the California

5

Court of Appeal for the Second Appellate District and the Supreme Court of California summarily denied his state habeas petition, Petitioner filed the instant federal petition for a writ of habeas corpus.  The parties do not dispute that state judicial remedies were exhausted for the claims asserted with regard to the 2005 hearing in this petition.

**2007 Parole Proceedings**

In the beginning of the hearing, the BPT panel discussed that no new psychological evaluation had been completed prior to the hearing, although Petitioner chose to waive the right to have a new evaluation, because he believed the issues to be addressed had already been discussed in his earlier evaluations.  2008 Ex. 2 at 14-15.

After reading the same description of the life crime contained in the probation report, the BPT discussed with Petitioner his version of the life crime.  Petitioner discussed that the victim and he argued from the beginning of their marriage and that she was very demanding.  *Id.* at 17-18.  Petitioner expressed that he resented his wife's family being present constantly but not assisting him with caring for her needs.  Resp. *Id.* at 18.  Petitioner discussed that alcohol abuse was a factor in the deterioration of his relationship with the victim.  *Id.* at 22-24.  Petitioner discussed his prior abuse of the victim, *Id.* at 26-28, and her abuse of their son, which he specified was never reported to the authorities.  *Id.* at 28-31.  Petitioner discussed that, at the time of the crime in 1980, he and the victim were seeing each other "mostly a way for us to, I guess have sex[,]" although he had another girlfriend living with him at the time.  *Id.* at 33.

Petitioner explained that he and the victim got into difficulties and, "[w]hen I had a complication with my wife, it was a response to a provocation of some sort.  Like jealousy or, you know, or the way she'd treat my son."  *Id.* at 37.  Petitioner explained that he "didn't know how to control my rage" in the face of his wife's persistence about having custody of their son, "[s]o I just grabbed what was next to me, according to the report it was a hammer, and I just went into a rage."  *Id.* at 41.  Petitioner stated that, "I reacted to my wife's provocation.  I guess she knew what buttons to push."  After the

6

1    crime, Petitioner "knew there was damage there, you know.  Enough to where a person
2    would be deceased." *Id.* at 42.  Petitioner explained that after the crime, he knew he was
3    in trouble, but that he "cleaned up after myself" that he disposed of her wheelchair and
4    returned her belongings and let her dog go because he didn't want them to "draw any
5    attention" *Id.* at 43.

6         The Board considered Counselor Studebaker's report from January 2007, as well
7    at the two 2004 psychological reports.  *Id.* at 56.  The panel also considered his prison
8    work and programming in prison, including his participation in Alcoholics Anonymous.
9    *Id.* at 57-63.  Petitioner discussed his responsibility for the life crime, his cowardice and
10   his belief that he was not minimizing his responsibility with the Board.  *Id.* at 74-77.
11   Petitioner also discussed his parole plans.  In response to the panel's questions about his
12   propensity to violence against women, Petitioner stated, "I realized why I did what I did,
13   because she couldn't hurt me, but I could hurt her.  She could hurt me with words and
14   charge up the credit cards....But no, I do not hate women and I don't lash out at women.
15   This is an isolated incident." *Id.* at 91.  The Assistant District Attorney informed the
16   panel of her opposition to parole, based in large part on Petitioner's minimization of his
17   role in the murder and other violence against the victim, lack of insight into himself and
18   concerns about testimony from him about his current wife.  *Id.* at 99-102.

19        After reviewing all the information received from the public, the BPT panel found
20   that Petitioner is not suitable for parole and would pose an unreasonable risk of danger to
21   society of a threat to public safety if released from prison.  *Id.* at 120.  The BPT found
22   the commitment offense was carried out in a very cruel and callous manner, due to the
23   victim being a paraplegic and of very small stature.  The panel also found that the victim
24   had been defiled and mutilated.   They further found that the crime was carried out with a
25   callous disregard for human suffering and that the motive was inexplicable in relation to
26   the crime.  *Id.* at 121.  The Board noted that Petitioner has a history of unstable and
27   tumultuous relationships, specifically with the victim.  The Board found that until further

28

progress is made, Petitioner continues to be unpredictable and a threat to others, and advised Petitioner to consider other self-help available in prison, besides AA. The BPT panel expressed that its greatest concern was Petitioner's ability to handle pent up anger and stress in a non-violent manner. *Id.* at 124. The BPT noted Petitioner's good and long work history and the progress he has made and denied parole for one year.

**State Court Proceedings**

Petitioner challenged the BPT's decision in the state superior, appellate and supreme courts. The Los Angeles County Superior Court was the last court to issue a reasoned decision. The court found that there was some evidence in the record to support the Board's finding that the crime was carried out in a manner that showed "exceptionally callous disregard for human suffering" because it involved "severe trauma to the helpless victim." 2008 Ex. 2 at 1. The court further found that the Board's decision that Petitioner posed a danger based on his history of "unstable and tumultuous relationships with others" was supported by some evidence. The court noted that this finding was supported by Petitioner's continued belief that his wife provoked the attacks with her behavior and Petitioner's admitted alcoholism and he required further psychological evaluation and programming to insure that he is able to understand and cope with stress and anger in a non-violent manner, particularly in connection with his relationship with women. *Id.* at 2. Petitioner's challenges in the Court of Appeal for the Second Appellate District and the California Supreme Court were denied without a reasoned decision. 2008 Ex. 8; 2008 Ex.10. The parties do not dispute that state judicial remedies were exhausted for the claims asserted with regard to the 2007 hearing in this petition.

## DISCUSSION

A. <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state

8

prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Under AEDPA, this court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d). Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

B. <u>Legal Claims and Analysis</u>

Petitioner claims that the BPT's denial of parole in 2005 and 2007 violated his right to due process because the decision was not supported by sufficient evidence.

1. <u>The BPT Decision</u>

California's parole scheme provides that the BPT "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and

9

gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). In making this determination, the BPT considers various factors, including the prisoner's social history, the commitment offense and prior criminal history, and his behavior before, during and after the crime. *See* Cal. Code Regs. tit. 15, § 2402(b) – (d).

The record shows that the BPT panel at both hearings afforded Petitioner and his counsel an opportunity to speak and present their case at the hearing, gave them time to review Petitioner's central file, allowed them to present relevant documents and provided a reasoned decision denying parole. At each hearing, the panel concluded that Petitioner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

2.     The State Court Decisions

After the 2005 hearing, the state superior court found that the panel's denial of parole was supported by "some evidence" in the record for its finding that Petitioner is unsuitable for parole because the crime was "dispassionate and calculated," that it demonstrated an "exceptionally callous disregard for human suffering" and that the victim was "abused, defiled or mutilated" during the crime, citing the applicable regulations. 2006 Ex. 4 at 2. The court also found some evidence to support the Board's finding that the motive was "very trivial" and that Petitioner was unsuitable based on prior violence against the victim. The California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petition.

After the 2007 hearing, the state superior court found that there was some evidence in the record to support the Board's finding that the crime was carried out in a manner that showed "exceptionally callous disregard for human suffering" because it involved "severe trauma to the helpless victim." 2008 Ex. 2 at 1. The court further found that the Board's decision that Petitioner posed a danger based on his history of

10

"unstable and tumultuous relationships with others" was supported by some evidence and that Petitioner had not adequately established that he was able to understand his actions and cope with stress and anger in a non-violent manner.

       3.       <u>The Federal Right to Due Process</u>

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002). The determination does not depend on whether a parole release date has ever been set for the inmate because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding him unsuitable for parole. *Sass*, 461 F.3d at 1125 (holding that the "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), applies to parole decisions in § 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same). The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the BPT] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455-56 (quoted in *Sass*, 461 F.3d at 1128). Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904. In sum, if the parole board's determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

The state court rejection of Petitioner's due process claims regarding his 2005 and

2007 hearings were not contrary to, or an unreasonable application of, the *Hill* standard, nor were they based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). In this case, Petitioner continues to pose an unreasonable risk of danger to society. There is some evidence in the record of each hearing to establish Petitioner's current dangerousness based on the fact that the commitment offense was carried out in an especially cruel manner and that the victim was abused, defiled or mutilated. Petitioner killed his former wife, who was a paraplegic and of small stature, by beating her to death on the head with a hammer and her body was found with portions of her skull and her brain missing. There is also some evidence in the record to support that the motive for the offense was trivial compared to the seriousness of murder and that There is also support in the record for the finding that Petitioner is dangerous based on an unstable social history, given the evidence in the record of Petitioner's history of domestic violence, including at least two prior incidents of beating the victim.

While Petitioner repeatedly argues that the state courts failed to adequately consider the uncontradicted evidence of "stress" he was under at the time of the murder given the heated custody argument between the him and the victim, the state courts appropriately considered the relevant factors in rendering the decisions that Petitioner presented a current danger to the public. In addition, while Petitioner had a positive prison record with regard to his work and participation in AA there, his testimony at each hearing regarding the victim's provocation of his attacks was found by the state courts to support the finding that he remains a current danger until he can establish sufficient insight regarding the crime and his response to stress. Such evidence in the record of the 2005 and 2007 hearings amounts to "some evidence" in support of the BPT's determination that Petitioner continued to present a risk of danger if released to the public, and consequently that Petitioner was not suitable for parole.

The Ninth Circuit has noted that "over time" the BPT's "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to

12

imprisonment" would "raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916. However, in this case, although the Board's denial of parole was based in part upon the especially cruel manner and evidence of abuse or mutilation of the victim in Petitioner's commitment offense, there were numerous other reasons for their denial of parole as well. Although Petitioner was well beyond the minimum term of commitment, here the BPT here has not merely relied on the unchanging facts of the commitment offense in denying Petitioner parole. *See, e.g., Irons*, 479 F.3d at 661 (upholding reliance upon commitment offense to deny parole at fifth parole hearing after petitioner had served 16 years in prison); *Sass*, 461 F.3d at 1129 (same, for second and third parole hearings after petitioner had served 11 and 12 years in prison).

Based upon the record in this case, the state courts' determination that there was some reliable evidence to support the BPT's decision, and that Petitioner's right to due process was not violated, was not contrary to or an unreasonable application of federal law. *See, e.g., Rosas*, 428 F.3d at 1232-33 (upholding denial of parole based on gravity of offense and psychiatric reports); *Biggs*, 334 F.3d at 916 (upholding denial of parole based solely on gravity of offense and conduct prior to imprisonment); *Morales*, 16 F.3d at 1005 (upholding denial of parole based on criminal history, cruel nature of offense, and need for further psychiatric treatment). Accordingly, habeas relief is not warranted on this claim.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: January 16, 2009

JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

HENRY AMADOR,

        Plaintiff,

  v.

A.P. KANE et al,

        Defendant.

Case Number: CV06-00493 JSW
CV08-01467 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 16, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Henry Amador
P.O. Box 705
C28545
Soledad, CA 93960

Dated: January 16, 2009

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk